**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WARREN MARTINEZ and
BERNICE MARTINEZ,

Plaintiffs,

vs. Case No. 3:02-cv-1100-J-32TEM

ALTEC INDUSTRIES, INC.,
PENSKE TRUCK LEASING CO.,
L.P., and SUMTER UTILITIES, INC.,

Defendants.

---

**ORDER**

This case is before the Court on defendant Sumter Utilities Inc.'s ("Sumter") Motion for Final Summary Judgment. (Doc. 183). Plaintiffs Warren and Bernice Martinez filed a response. (Doc. 191). Sumter, after receiving leave of the Court, filed a reply. (Doc. 201). The Court heard oral argument on June 15, 2005, the proceedings of which are hereby incorporated by reference. (Doc. 223).

## I. Summary Judgment Standard

Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rink v. Cheminova, Inc., 400 F.3d 1286, 1294 (11th Cir. 2005) (quoting Fed.R.Civ.P. 56(c)). On a

motion for summary judgment, the Court construes all facts and draws all reasonable inferences "in the light most favorable to the non-moving party." McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002).

## II. Background

Mr. Martinez, a Sumter employee, was directed by his foreman Joe Ellis to perform "climbing inspections" of utility poles carrying Jacksonville Electric Authority transmission lines. (Ellis Dep. at 15, 47-48). A climbing inspection involves striking the wooden utility pole with a hammer every four to six feet to determine whether the pole is rotten. (Id. at 15-16).[1] To perform this task, Mr. Martinez used an aerial lift manufactured by defendant Altec Industries, Inc. ("Altec"), and leased to Sumter by defendant Penske Truck Leasing Co., L.P. ("Penske"). (Id. at 22). The aerial lift is a truck that has a two-piece arm (the pieces are identified as the upper boom and the lower boom). At the end of the upper boom is a bucket in which the operator (here, Mr. Martinez) stands. The bucket also has controls that allow the operator to manipulate it into the desired position. On January 9, 2002, while moving the bucket into position to inspect a pole, Mr. Martinez was electrocuted and severely injured. (Id. at 48; Doc. 87 at ¶ 7).

---

[1] Additionally, the climbing inspections involved placing a screwdriver or ruler into woodpecker holes to determine their depth and inspecting and repairing static wires located at the top of the poles. (Id. at 16-18).

Plaintiffs' initial Complaint alleged strict liability and negligence claims against defendants Altec and Penske. (Doc. 1). After receiving leave of the Court, plaintiffs filed an Amended Complaint which added Sumter as a defendant. (Doc. 87). Plaintiffs' intentional tort claim alleges that Sumter hired Mr. Martinez "even though he had very limited experience in working with high voltage electricity and even though [Sumter] knew it would have language problems communicating with him"; failed to provide Mr. Martinez with any training or access to safety brochures; ordered Mr. Martinez to conduct inspections of utility poles that required him to come closer to transmission power lines than the minimum approach distance required by OSHA and Sumter's own policy; and required him to perform these inspections without the proper safety equipment and in an aerial lift that had component parts that could cause electrocution. (Id. at ¶¶ 38-46).

Sumter subsequently moved to dismiss plaintiffs' intentional tort claim, arguing that the allegations of the Amended Complaint were insufficient to satisfy the intentional tort exception to the Florida Workers' Compensation Act. (Doc. 89). The Report and Recommendation issued by United States Magistrate Judge Thomas E. Morris recommended that the Court deny Sumter's motion. (Doc. 148). Judge Morris reasoned that "upon allegations that Sumter required an untrained employee on an aerial lift to use a hammer to strike a power pole carrying 69,000 volt transmission lines, coming within less than five feet, or perhaps even less than

three feet of the line, contrary to company policy and OSHA regulations, a reasonable person would understand that the employer's conduct was substantially certain to cause death or injury." (Id. at 15). Judge Morris also suggested that "[s]hould facts obtained during discovery negate the key allegations in the complaint, Sumter could raise the matter on a motion for summary judgment." (Id.). The Court subsequently adopted Judge Morris' Report and Recommendation and denied Sumter's motion to dismiss. (Doc. 173). In the Order adopting the Report and Recommendation, the Court noted that plaintiffs also alleged that Sumter concealed a known danger in failing "to disclose the defective condition of the aerial lift." (Id. at 3). Sumter has now filed the instant motion for summary judgment, arguing that the parties' discovery refutes the material allegations of plaintiffs' Amended Complaint and that, even if plaintiffs' allegations are proven, Sumter's conduct still does not satisfy the intentional tort exception. (Doc. 183 at 2).

## III. Discussion

Sumter argues that it has immunity from plaintiffs' claim under the Florida Workers' Compensation Act. (Doc. 183 at 10) (citing Fla. Stat. § 440.11 (2001)). "Florida's Workers' Compensation Law . . . protects workers and compensates them for injuries occurring in the workplace, without examination of fault in the causation of injury." Gerth v. Wilson, 774 So. 2d 5, 6 (Fla. 2d DCA 2000). Under

this system, "the employee gives up a right to a common-law action for negligence in exchange for strict liability and the rapid recovery of benefits." Turner v. PCR, Inc., 754 So. 2d 683, 686 (Fla. 2000). The Workers' Compensation Act is "the exclusive remedy for accidental injury or death arising out of work performed in the course and the scope of employment" for employees covered under its purview. Id. (quotations and citations omitted). However, while employers are generally immune from tort liability under the Act, the Florida Supreme Court has recognized an exception for intentional torts committed by the employer against the employee. Id. (citing Eller v. Shova, 630 So. 2d 537, 539 (Fla. 1993)).

Plaintiffs argue that this case fits within the intentional tort exception. "[I]n order to prove an intentional tort, the employer must be shown to have either exhibited a deliberate intent to injure or engaged in conduct which [was] substantially certain to result in injury or death." Turner, 754 So. 2d at 687 (quotations and citation omitted; emphasis in original). Here, plaintiffs allege that Sumter engaged in conduct substantially certain to cause Mr. Martinez's injury or death. (Doc. 87 at ¶¶ 44, 45, 48-50). Substantial certainty is evaluated under an objective standard. See Turner, 754 So. 2d at 688-89. Under this standard, "an employee need only show that a reasonable person would understand that the employer's conduct was substantially certain to result in injury to the employee." EAC USA, Inc. v. Kawa, 805 So. 2d 1, 4 (Fla. 2d DCA 2001); see also Turner, 754

So. 2d at 688. However, "a showing of negligence, or even gross negligence, is not enough." Tinoco v. Resol, Inc., 783 So. 2d 309, 310 (Fla. 3d DCA 2001).[2]

As the Court noted in denying Sumter's motion to dismiss, "there is not a clear bright-line dividing those cases wherein substantial certainty was found from those in which it was not." (Doc.173 at 2). However, cases where courts have found an intentional tort under the Turner standard "characteristically [involve] a degree of deliberate or willful indifference to employee safety." Pacheco v. Florida Power & Light Co., 784 So. 2d 1159, 1163 (Fla. 3d DCA 2001); see also Sierra v. Associated Marine Insts., 850 So. 2d 582, 587 (Fla. 2d DCA 2003) ("Most of the Florida cases addressing this issue also involve allegations that the employer knowingly created or permitted a dangerous physical condition in the workplace."). Additionally, cases where the intentional tort exception is satisfied often include "evidence that the employer tried to cover up the danger, affording the employees no means to make a reasonable decision as to their actions." The Bombay Co.,

---

[2] In 2003, the Florida legislature amended § 440.11. See Florida Statutes § 440.11(1)(b) (2004). The amendment codified the intentional tort exception, but altered the substance of the exception as it was set forth in Turner. See Travelers Indem. Co. v. PCR, Inc., 889 So. 2d 779, 783 n.5 (Fla. 2004). The 2003 amendment, however, is not "retroactively applicable." Feraci v. Grundy Marine Constr. Co., 315 F. Supp. 2d 1197, 1205 n.11 (N.D. Fla. 2004). Mr. Martinez's injury occurred in 2002, and thus the 2002 version of § 440.11 and Turner govern this case. Id.; see also The Bombay Co. v. Bakerman, 891 So. 2d 555, 557 n.* (Fla. 3d DCA 2004), rev. granted, 903 So. 2d 189 (Fla. 2005) ("Because the incident in this case occurred in 1997, the 1997 version of the statute governs here and the 2003 amendment has no application.").

891 So. 2d at 557 (quoting Turner, 754 So. 2d at 691); see also Connelly v. Arrow Air, Inc., 568 So. 2d 448, 451 (Fla. 3d DCA 1990) ("[W]here the employer . . . withholds from an employee . . . knowledge of a defect or hazard which poses a grave threat of injury so that the employee is not permitted to exercise an informed judgment whether to perform the assigned task, the employer will be considered to have acted in a belief that harm is substantially certain to occur.") (quotations and citation omitted).[3]

Sumter argues that summary judgment should be granted because "it is undisputed that [Mr.] Martinez was trained and understood safety requirements, was able to communicate effectively with his foreman, did not violate the OSHA safe approach distance, and Sumter was not aware of the defect in the lift." (Doc. 183 at 17). Furthermore, Sumter argues that even if plaintiffs can prove many of their allegations, its conduct would "constitute ordinary negligence at best." (Id.). Plaintiffs counter that Sumter knew that requiring Mr. Martinez to work within five feet of 69,000 volt transmission lines was substantially certain to result in his injury or death, and that notwithstanding this knowledge, Sumter required him to get close enough to the utility poles on which those lines were strung to strike them with a hammer and measure the depth of woodpecker holes. (Doc. 191 at 12-13).

---

[3] Although Connelly was decided before Turner, the Turner court relied on the Connelly decision in formulating the substantial certainty standard. See Turner, 754 So. 2d at 690-91.

Plaintiffs further contend that Sumter did not provide Mr. Martinez with any training to perform this task and failed to provide the necessary safety equipment even after Mr. Martinez's foreman, Joe Ellis, requested such equipment. (Id. at 13). Finally, plaintiffs assert that Sumter knew that there was exposed metal on the aerial lift that would conduct electricity to the controls in the bucket and that it failed to disclose that information to Mr. Martinez. (Id. at 13).

Construing the evidence in the light most favorable to plaintiffs, there are genuine issues of material fact as to each of plaintiffs' allegations against Sumter in their Amended Complaint, and thus there is a genuine issue of material fact as to "whether a reasonable person would understand that the employer's conduct was substantially certain to result in injury to the employee." Kawa, 805 So. 2d at 4. Steve Courson, the Sumter superintendent for the inspections that Mr. Martinez was performing, testified that serious injury and certain death can result from working near energized transmission lines. (Courson Dep. at 38). However, despite this serious and certain danger, Sumter directed Mr. Martinez's crew to perform climbing inspections of JEA utility poles carrying 69,000 volt transmission lines. (Ellis Dep. at 23). Mr. Ellis testified that his supervisor, Mr. Courson, instructed him to perform the climbing inspections. (Id.) This activity required Mr. Martinez to come closer to the transmission lines than the minimum approach distance of five feet that was required by Sumter, (Jones Dep. at 107-08; Courson

Dep. at 39-40, Browning Dep. 29, 38-39),[4] and the three feet minimum approach distance required by OSHA. (Morgan Dep. at 17-18).[5] Bruce Jones, a Sumter vice president who investigated Mr. Martinez's incident, admitted that Mr. Martinez's failure to maintain the appropriate clearances from energized transmission lines could have been a "contributing cause" of this incident, and that it was "very possible" that this incident would not have happened had he maintained the five foot approach distance that Sumter normally requires. (Jones Dep. at 125-26). Mr. Jones also testified that at the time of the accident, Mr. Martinez was doing what his foreman Mr. Ellis had instructed him to do. (Jones Dep. at 56).

To perform the climbing inspections, Sumter provided the crew with an Altec aerial lift. (Ellis Dep. at 22). However, during the first week of inspections, Mr. Ellis determined that the latch on the bottom of the upper boom was "tied together"

---

[4] Mr. Courson testified that it was obvious to both he and Mr. Jones that Mr. Martinez was within Sumter's minimum approach distance at the time of the accident. (Courson Dep. at 39-40). Additionally, Mr. Jones testified that Sumter's five foot minimum approach distance includes both the aerial device and the operator. (Jones Dep. at 107-08).

[5] Sumter states in its motion for summary judgment that Mr. Ellis' employment was terminated following Mr. Martinez's incident because of his "failure to ensure that Plaintiff and the crew adhered to Sumter and OSHA safety practices." (Doc. 183 at 18 n.39).

with the controls in the bucket[6] and informed Mr. Courson of this fact. (Id. at 51-53). Mr. Ellis testified that he told Mr. Courson "that the latch on that boom was tied into the rest of the – to all the steel that's in the boom to support the winch and the jib, and the control pad – control handle is all tied together." (Id. at 53). Mr. Courson's response, in Mr. Ellis' words, was "[n]othing special," (Id.), and the crew continued to use the aerial lift to conduct the inspections for approximately six more months until Mr. Martinez's injury. (Id. at 22-23). Mr. Martinez was never informed that the latch and controls were connected in such a manner that electricity would flow from the exposed latch to the controls.[7] (Martinez Aff. at ¶¶ 2-

---

[6] Plaintiffs' expert John Frost opines that the current that caused Mr. Martinez's injuries entered the aerial lift when "the uppermost energized phase conductor was contacted by a portion of the conductive metallic . . . latch that protruded out of an insulating guard on the underside of the insulated upper boom." (Frost Report at 5). "[T]he current came into that latch, went through the cylinder, into the super structure, across to the bucket support frame work, to which all of the controls were directly bolted." (Frost Dep. at 67). The current entered Mr. Martinez, according to Frost, from several points in the framework of the controls. (Id.).

[7] Mr. Ellis testified that he informed Mr. Martinez that the latch and controls were connected. (Ellis Dep. at 52). Mr. Ellis and Mr. Martinez often had trouble communicating because Mr. Martinez speaks little English and Mr. Ellis speaks little Spanish. (Id. at 21). To overcome this language barrier, Mr. Ellis would draw Mr. Martinez pictures or, if that failed, would call Mrs. Martinez to translate. (Id.). Mr. Ellis testified that he called Mrs. Martinez to make sure that Mr. Martinez understood that the latch and the controls were connected. (Id. at 53). Mr. Martinez, however, denies that he was ever informed of the connection through the use of Mrs. Martinez as a translator or otherwise. (Martinez Aff. at ¶¶ 2-3).

3; Martinez 2005 Dep. at 57).[8]

Additionally, before the incident, Mr. Ellis requested a hot stick with a hammerhead mount. (Ellis Dep. at 31). This hot stick would have allowed Mr. Martinez to conduct the climbing inspections while staying "further away from the pole." (Id.). Sumter, however, never provided Mr. Ellis' crew with the hot stick. (Id.).

Finally, it is not undisputed, as Sumter contends, that Mr. Martinez was adequately trained to perform the tasks he was assigned. Mr. Jones, Sumter's vice president who investigated this incident, testified as follows:

> Q: Did he [Mr. Martinez], to your knowledge, receive any type of training from Sumter once he was hired.
>
> A: Not to my knowledge. Just on-the-job training.
>
> Q: As a result of your investigation, sir, did you find out whether Mr. Martinez received any transmission voltage

---

[8] Sumter argues that it is undisputed that it never received a notice from Penske that Altec had designed a modified cover for the latch that reduced the amount of metal from the latch that was exposed under the existing insulating cover. From this Sumter claims that there is no evidence that it had "higher knowledge" of the danger from the exposed metal on the boom than Mr. Martinez did. However, Mr. Ellis testified that he told Mr. Courson that the latch was electrically connected to the control handle in the bucket. It is reasonable to infer that if Mr. Ellis was aware of and specifically referenced the latch on the boom, he was also aware that the latch was partially exposed beyond the insulating cover. Thus, there is a reasonable inference to be drawn that, at the very least, Mr. Ellis – the Sumter employee who was overseeing Mr. Martinez and directing him to perform climbing inspections – knew about the danger to the operator of the aerial lift from the exposed metal from the latch.

> O.J.T. [On the Job Training] from Sumter?
>
> A: No.
>
> Q: You didn't find out, or he did not receive it?
>
> A: He did not.
>
> Q: Should he have?
>
> A: If he was going to work on energized systems, yes.
>
> . . .
>
> Q: All right. What parts of the incident suggest that he was working [on energized systems]?
>
> A: Well, the contact was made.

(Jones Dep. at 109). Sumter relies on Mr. Martinez's prior experience as a lineman in Puerto Rico as evidence that he was adequately trained for the position. However, Mr. Martinez testified that he never worked on transmission lines while he was in Puerto Rico. (Martinez 2005 Dep. at 35). Furthermore, Mr. Courson testified about the relevance of Mr. Martinez's experience:

> Q: The fact that Mr. Martinez was a journeyman lineman, did that make him eligible to work on hot lines?
>
> A: If it would've been distribution voltages, yeah. But not transmission.[9] I mean not working directly on the line. I mean the voltage they were doing was too much to be working on directly.

[9] Transmission lines carry much greater voltage than distribution lines.

(Courson Dep. at 62-63).

Sumter, relying heavily on Kline v. Rubio, 652 So. 2d 964 (Fla. 3d DCA 1995), and Subileau v. Southern Forming, Inc., 664 So. 2d 11 (Fla. 3d DCA 1995), also argues that even if many of plaintiffs' allegations are proven, they do not satisfy the intentional tort exception. (Doc. 183 at 17-19). In Kline, the plaintiff was injured while using a meat tenderizing machine in the course of her employment for the defendant. Kline, 652 So. 2d at 965. The defendant had left the machine freestanding even though it was meant to be bolted down, had removed a safety cover and the manufacturer's safety warnings, and had not trained the plaintiff on the machine. Id. Additionally, the machine had been repaired in such a manner that the emergency cut-off switch had been bypassed. Id. The Kline court, relying heavily on the Florida Supreme Court's decisions in Fisher v. Shenandoah General Construction Co., 498 So. 2d 882 (Fla. 1986), and Lawton v. Alpine Engineered Products, Inc., 498 So. 2d 879 (Fla. 1986), held that "although the corporate defendant was certainly negligent in its cavalier attitude toward the safety of its employees, its actions did not rise to the level of an intentional tort." Kline, 652 So. 2d at 965.

In Subileau, the plaintiff's husband fell from the defendant's elevated work site to his death. 664 So. 2d at 11. The defendant had failed to provide guardrails and other protections for its workers. Id. The Subileau court affirmed the trial

court's granting of summary judgment in favor of the defendant, reasoning that "[t]he potential danger or hazard of working on these elevated worksites without guardrails or safety devices was known and obvious to the employees." Id. at 12.

The Court finds that Kline and Subileau are inapplicable to the present case. First, both pre-date the Florida Supreme Court's decision in Turner. Additionally, Kline relies heavily on the Florida Supreme Court's decisions in Fisher and Lawton, both of which found that the plaintiff had failed to plead facts sufficient to constitute an intentional tort on the part of the employer. In Turner, however, the Florida Supreme Court receded "from Fisher and Lawton to the extent those cases can be read as rejecting the facts as stated therein as a sufficient basis to support an allegation of substantial certainty of injury." Turner, 754 So. 2d at 691 n.8.[10] Finally, unlike the instant case, Sublieau involved a known and obvious hazard. Sublieau, 664 So. 2d at 12. Here, while Mr. Martinez was no doubt aware that working in close proximity to power lines was hazardous, taking the evidence in the light most favorable to the plaintiffs, he was unaware that he was performing that work in an aerial lift that had an exposed metal latch that was not electrically

---

[10] See John T. Barnett, The Enigma of Workers' Compensation Immunity: A Call to the Legislature for a Statutorily Defined Intentional Tort Exception, 28 Fla. St. U. L. Rev. 491, 506 (2001) ("Thus, in two passing footnotes, the supreme court in Turner overruled every case in Florida that has relied on the 'virtual certainty' standard in Fisher and Lawton and/or every opinion that has relied on Fisher and Lawton's factual determinations that certain behavior does not rise to the level of 'substantial certainty.'").

insulated from the controls in the bucket. (Martinez Aff. at ¶¶ 2-3, Martinez 2005 Dep. at 57, Martinez 2003 Dep. at 63-64).[11]

Sumter also relies on Pacheco, which, at first glance, involves somewhat similar facts to the instant case. In Pacheco, a worker was electrocuted and killed when his metal measuring tape came into contact with an energized power line. 784 So. 2d at 1160. The worker's estate sued his employer and the general contractor under the intentional tort exception. Id. at 1163. The defendants "either forgot or neglected to tell Florida Power & Light to de-energize the lines or to tell their workers they had failed to do so." Id. The Pacheco court affirmed the trial court's granting of summary judgment in favor of the defendants, concluding that "[w]hile these derelictions were very serious and had tragic consequences, we cannot find that they rise to the level of an intentional tort required to invoke the Turner exception." Id. The court reasoned that "the cases which have actually applied the Turner doctrine . . . have characteristically involved a degree of deliberate or willful indifference to employee safety which simply does not exist in

---

[11] This fact also distinguishes this case from several other Florida cases where courts have held that the intentional tort exception was not satisfied. See The Bombay Co., 891 So. 2d at 557 (noting that "the dangerous condition was evident to the employee and there was no concealment of the danger"); Allstates Fireproofing, Inc. v. Garcia, 876 So. 2d 1222, 1226 (Fla. 4th DCA 2004) (noting that the employer did not fail to notify the decedent employee of the danger and that the danger should have been obvious to the decedent); Tinoco, 783 So. 2d at 310 (operating defect of machine that caused plaintiff's injury was obvious to all those who were working near the machine).

this case." Id. Construing the facts in the light most favorable to plaintiffs, in the instant case, unlike Pacheco, Sumter knew of the allegedly dangerous condition (that the exposed latch was not insulated from the controls in the bucket), failed to inform Mr. Martinez of that dangerous condition, and continued to direct him to conduct climbing inspections too close to utility poles carrying 69,000 volt transmission lines, work that he was not properly trained to perform, and without requested safety equipment. There are triable issues of material fact concerning whether plaintiff can prove an intentional tort exception to the Florida Workers' Compensation Act.

Accordingly, it is hereby **ORDERED:**

Defendant Sumter Utilities Inc.'s Motion for Final Summary Judgment (Doc. 183) is **DENIED**.[12]

**DONE AND ORDERED** at Jacksonville, Florida this 3rd day of August, 2005.

TIMOTHY J. CORRIGAN
United States District Judge

j.
copies:
counsel of record

[12] Acknowledging the high standard required for a plaintiff to prove the intentional tort exception, the Court does not foreclose revisiting this issue following the close of plaintiffs' case-in-chief.