# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

WARREN MARTINEZ and
BERNICE MARTINEZ,

                    Plaintiffs,

vs.                                             Case No. 3:02-cv-1100-J-32TEM

ALTEC INDUSTRIES, INC.,
PENSKE TRUCK LEASING CO., L.P.,
and SUMTER UTILITIES, INC.,

                    Defendants.

_____

## <u>ORDER</u>

This case is before the Court on defendant Penske Truck Leasing Co., L.P.'s ("Penske") Motion to Strike Plaintiffs' Expert Witnesses' Testimony (Doc. 179), defendant Altec Industries, Inc.'s ("Altec") Motion to Exclude or Limit Testimony of Expert Witness John Frost (Doc. 186), Altec's Motion to Strike the Testimony of Thomas Kurfess (Doc. 182), and Altec's Motion to Strike the Testimony of John Dorsey (Doc. 181).  Plaintiffs Warren and Bernice Martinez filed a consolidated response to defendants' motions.  (Doc. 196).  The issue presented is whether plaintiffs' expert witnesses John Frost, Thomas Kurfess, and John Dorsey satisfy the requirements for expert testimony set forth by the Supreme Court in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and <u>Kumho Tire Company, Ltd. v. Carmichael</u>, 526 U.S. 137 (1999).

## I.  Background

On January 9, 2002, Warren Martinez was electrocuted while inspecting

utility poles owned by the Jacksonville Electric Authority.  At the time, Mr. Martinez

was using an A77T-E93 Insulated Aerial Lift Device ("aerial lift") manufactured by

Altec.  The aerial lift was leased by Penske to Sumter Utilities, Inc. ("Sumter"), Mr.

Martinez's employer.

In their Amended Complaint, plaintiffs assert strict liability and negligence

claims against Altec and Penske, and an intentional tort claim against Sumter.

(Doc. 87).  Altec and Penske filed the instant <u>Daubert</u> motions to exclude the

testimony of plaintiffs' expert witnesses Thomas Kurfess and John Dorsey.   (Docs.

179, 181, 182).  Altec has also moved to exclude the testimony of plaintiffs'

proposed expert John Frost.  (Doc. 186).[1]

## II.  Discussion

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods

---

[1]  While Sumter did not file any <u>Daubert</u> motions, it did file a Motion for Final
Summary Judgment.  (Doc. 183).  That motion is addressed in a separate Order.

reliably to the facts of the case.

Fed.R.Evid. 702.  In <u>Daubert</u>, the Supreme Court instructed that district courts are to perform a "gatekeeping" role concerning the admission of expert scientific testimony, 509 U.S. at 592-93, and subsequently made it clear in <u>Kumho Tire</u> that the "gatekeeping" role also applies to expert technical testimony.  <u>Kumho Tire</u>, 526 U.S. at 147.  In performing its gatekeeping function, the Court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (<u>en</u> <u>banc</u>) (quoting <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998)). The proponent of the expert testimony bears the burden of proving that the <u>Daubert</u> requirements are satisfied.  <u>McDowell v. Brown</u>, 392 F.3d 1283, 1298 (11th Cir. 2004).  "The Supreme Court did not intend, however, that the gatekeeper role supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  <u>Id.</u> at 1299 (quotations and citations omitted).

3

## A.  John Frost

Mr. Frost is an engineer who is currently the Chief of the Safety Office at the Army's Aviation and Missile Command.  His report concludes that the electrical current that caused Mr. Martinez's injuries entered the aerial lift "when the uppermost energized phase conductor was contacted by a portion of the conductive metallic Upper Boom Restraint latch that protruded out of an insulating guard on the underside of the insulated upper boom."  (Frost Report at 5).  This contact was possible, according to Mr. Frost, because the insulating guard that surrounded the latch did not fully enclose and protect it from contact with energized conductors.  (Id. at 6).  Once the latch was energized, Mr. Frost opines that the voltage "traveled through the Jib Rotation Hydraulic Cylinder to the conductive metallic structures that support the jib."  (Id. at 7).  The current then traveled to the metal frame to which the bucket was attached "and the framework supporting the upper controls attached to the insulated work platform."  (Id. at 8).  The current then exited the framework of the controls at several points, "went into Mr. Martinez's right arm, through his body, and came out his left forearm."  (Frost Dep. at 67).  After the current exited Mr. Martinez's left arm, Mr. Frost opines that it traveled to a "grounded object on the pole."  (Id.).  Mr. Martinez's injuries could have been prevented, according to Mr. Frost, if:  (1) the latch and the jib tilt hydraulic cylinder were not mounted on the same portion of the boom (Frost

4

Report at 11); (2) the latch was protected by an insulating guard that fully covered the latch, such as the revised guard Altec had designed but was not installed on this particular aerial lift (Id.; Frost Dep. at 92); or (3) the control handles and adjacent support structures were "electrically isolated from the work platform support structure or guarded to prevent contact by the operator or other conductive objects." (Frost Report at 14).

Altec argues that Mr. Frost cannot satisfy the qualifications or reliability prong of the Daubert inquiry. (Doc. 186 at [unnumbered] 6-11). As to Mr. Frost's qualifications, Altec argues that he lacks any experience in designing fiberglass insulating covers such as the one at issue in this case, and has never designed an insulating guard for use around high voltage power lines. (Id. at [unnumbered] 6-7). Plaintiffs respond that Mr. Frost has been a practicing safety engineer for 31 years, has designed guards for high voltage appliances, has tested and inspected aerial lift devices, and has investigated numerous accidents and electrocutions. (Doc. 196 at 13-14).

Rule 702 provides that a witness's expert status may be based on "knowledge, skill, experience, training, or education." Fed.R.Evid. 702; see also Frazier, 387 F.3d at 1260-61 (recognizing that "experts may be qualified in various ways" and that "[w]hile scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status"). Mr. Frost

has a bachelor's degree in electrical engineering from the University of Virginia and a master of science in industrial engineering (with a specialization in safety engineering) from Texas A&M University. (Frost Report at 2). He has been a practicing safety engineer with the Army for 31 years. (Id.). He is certified as a Utility Safety Administrator by the National Safety Council and is a member of the American Society of Safety Engineers. (Id. at 2-3). While at Texas A&M and in the Army, Mr. Frost was trained in "guarding techniques." (Frost. Dep. at 14-15). Additionally, Mr. Frost has been involved in the designing of various guards for high voltage applications. (Id. at 15-19). Mr. Frost also participated in the drafting of military standards dealing with high current protection and "guarding for high current situations," (Id. at 20), and has taught electrical safety classes for the Army. (Id. at 84-85). Furthermore, Mr. Frost has served as an expert in several cases involving aerial lift electrocutions, including one case in this district. (Id. at 53-55); see Walters v. Altec Indus., Inc., No. 3:01-cv-371-J-12TEM, Doc. 102 (denying Altec's Daubert motion to exclude the expert testimony of Mr. Frost in a case where the plaintiff was electrocuted while working on high voltage power lines in an aerial lift). Mr. Frost also testified that his "whole life as a safety engineer" has dealt with constraining and controlling electric voltages. (Id. at 160-61). The Court concludes that Mr. Frost satisfies the qualifications prong of the Daubert analysis. See Rushing v. Kansas City S. Ry. Co., 185 F.3d 496, 507 (5th Cir.

1999) ("As long as some reasonable indication of qualifications is adduced . . .

qualifications become an issue for the trier of act rather than for the court in its

gate-keeping capacity."), <u>superseded by rule on other grounds as recognized in</u>

<u>Mathis v. Exxon Corp.</u>, 302 F.3d 448, 459 n.16 (5th Cir. 2002).  That Mr. Frost has

not designed a fiberglass guard similar to the one at issue in this case goes to the

"weight and credibility of his testimony, not its admissibility."  <u>Indiana Ins. Co. v.</u>

<u>Valmont Elec., Inc.</u>, No. TH 97-0009-C-T/F, 2001 WL 1823587, at *7 (S.D. Ind.

Dec. 27, 2001) (concluding that a proffered expert satisfied <u>Daubert</u>'s qualifications

prong where the expert had an electrical engineering degree and worked with

capacitors for fifty years even though the majority of his work did not involve the

specific device at issue); <u>see also</u> <u>Marmol v. Biro Mfg. Co.</u>, No. 93 CV 2659(SJ),

1997 WL 88854, *5 (E.D.N.Y. Feb. 24, 1997) (concluding that defendant's

argument that plaintiff's expert should be excluded because he had never

personally designed the type of product at issue went "to the weight and credibility

of the testimony rather than its admissibility").

Altec also argues that Mr. Frost's proffered opinions and testimony fails the

reliability prong of the <u>Daubert</u> inquiry.  (Doc. 186 at [unnumbered] 7-11).  Altec

claims that Mr. Frost's theories have not been successfully tested on an aerial lift;

that he fails to sufficiently demonstrate how his experience leads to his

conclusions; that his conclusions are nothing more than his own "self acclamation";

and that his theories have not been subjected to peer review, have no known rate

of error, and do not enjoy general acceptance in the relevant technical community.

(Id.).  Plaintiffs respond that Mr. Frost adequately explains the basis of his opinions

and that they are consistent with "the physical evidence, the dielectric testing that

was done by Sumter and has previously been done by [Mr. Frost], and general

scientific law."  (Doc. 196 at 14).  Plaintiffs also assert that Altec's own dielectric

testing results show that the modified guard would have protected Mr. Martinez

from injury, and that no expert retained by Altec has challenged Mr. Frost's

testimony or methodology.  (Id. at 14-15).

     The Eleventh Circuit has instructed that "[w]hile there is inevitably some

overlap among the basic [Daubert] requirements – qualification, reliability, and

helpfulness – they remain distinct concepts and the courts must take care not to

conflate them."  Frazier, 387 F.3d at 1260.  When determining the reliability of an

expert opinion, courts consider when practicable: "(1) whether the expert's theory

can be and has been tested; (2) whether the theory has been subjected to peer

review and publication; (3) the known or potential rate of error of the particular

scientific technique; and (4) whether the technique is generally accepted in the

scientific community."  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d

1333, 1341 (11th Cir. 2003).  "These factors are illustrative, not exhaustive; not all

of them will apply in every case, and in some cases other factors will be equally

important in evaluating the reliability of proffered expert opinion." Frazier, 387 F.3d at 1262; see also United States v. Brown, Nos. 03-15413, 03-15459, 2005 WL 1594456, at *10 (11th Cir. July 8, 2005) ("[E]xpert testimony that does not meet all or most of the Daubert [reliability] factors may sometimes be admissible."). Indeed, "the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under Daubert" and a district court has "considerable leeway in the execution of its duty." Brown, 2005 WL 1594456 at *7 (quotations and citations omitted).

Altec first argues that Mr. Frost's theory that a better latch guard would have prevented the accident has "never been successfully tested with regards to any aerial device, much less an aerial device similar to the subject of this litigation." (Doc. 186 at [unnumbered] 8).  Instead, Altec claims, relying on Clark v. Takata Corp., 192 F.3d 750 (7th Cir. 1999), that Mr. Frost's testimony should be excluded because he has failed to explain any basis for his conclusions.  (Id.).

In Clark, the plaintiff's expert sought to testify that a lap belt unbuckled during a rollover accident of a vehicle and that a properly functioning belt would have prevented the plaintiff from hitting the vehicle's roof during the rollover. Clark, 192 F.3d at 756.  The Seventh Circuit affirmed the district court's exclusion of the expert's testimony.  Id. at 759.  The Clark court reasoned that the expert simply assumed the first fact that he was hired to prove (that the lap belt unbuckled

9

during the rollover).  Id. at 757.  Additionally, the court found that while "[e]ither

hands-on testing or review of experimental, statistical, or other scientific data

generated by others in the field may suffice as a reasonable methodology upon

which to base an opinion," the expert "failed to identify, much less offer, any

evidence to support his conclusion that a lap belt, if properly fastened, could have

stopped [the plaintiff] from hitting the roof."  Id. at 758 (quotations and citation

omitted).

        This case is distinguishable from Clark.  In arriving at his conclusions, Mr.

Frost reviewed photographs of the scene of the accident and the aerial lift Mr.

Martinez was operating, photographs of Mr. Martinez's injuries, the clothing Mr.

Martinez was wearing at the time of the accident, Altec consumer notices relating

"to the Electrical Continuity Hazard," the American National Standards Institute

("ANSI") standard for "Vehicle Mounted Elevating and Rotating Aerial Devices," the

Occupational Safety and Health Administration ("OSHA") investigative file,

drawings of the bucket truck, applicable OSHA safety standards, and several

depositions.  (Frost Report at 2-3; Frost Dep. at 100-101).  Mr. Frost explained

both in his report and his deposition how these materials impacted his conclusions.

(Frost Report at 5-14; Frost Dep. at 66-68, 71-78).  Additionally, Mr. Frost relied on

dielectric testing of the aerial lift done the day after the accident, (Frost Report at 3;

Frost Dep. at 69-70, 80); reviewed testing done by Altec, (Frost Dep. at 39);

10

conducted his own testing on aerial lifts, including testing on "the cover on an Altec

unit," (Frost Dep. at 35-38); and reviewed an "injury unit" aerial lift in another

electrocution case as well as an exemplar aerial lift provided by Altec in

conjunction with this case. (Frost Dep. at 80-82). Mr. Frost also has extensive

experience investigating aerial lift electrocution accidents. (Id. at 53-55). Finally,

in concluding that the revised guard developed by Altec would have prevented the

accident, Mr. Frost used the formula relied upon by OSHA to determine standoff

distances. (Id. at 98-99, 140-50). Thus, unlike the expert in Clark, Mr. Frost has

relied upon testing, observation, scientific data, and his experience in coming to his

conclusions. The Court concludes that Mr. Frost satisfies the reliability inquiry

under Daubert. See Fenimore Am. River Transp. Co., No. Civ.A. 04-1495, 2005

WL 106776, at *2 (E.D. La. Jan. 18, 2005) (Expert with engineering degree,

experience in vessel rigging inspection, and experience teaching vessel rigging

satisfied the reliability prong of the Daubert standard where the expert "relied on

his experience, discovery documents, several depositions, a physical examination

and photographs of the [vessel], a physical examination and photographs of a

barge similar to the one  on which [the plaintiff] was injured, and [OSHA]

regulations"); Walters v. Altec Indus., Inc., No. 3:01-cv-371-J-12TEM, Doc. 102

(denying Altec's motion to exclude Mr. Frost's testimony). Altec's motion to strike

Mr. Frost's testimony is due to be denied.[2]

## B.  Thomas Kurfess

Dr. Kurfess is a professor of mechanical engineering at the Georgia Institute of Technology.  He offers five conclusions on how the aerial lift could be modified to prevent the bucket from energizing when the boom latch makes contact with an energized conductor: (1) eliminating the electrical continuity between the latch and the hydraulic cylinder by moving the latch and clamp "to a location further down the upper and lower boom"; (2) using the modified cover designed by Altec; (3) creating an interlock system that would prevent the damage to the latch cover by preventing the upper boom from moving into the latched position prior to being fully retracted; (4) adding a visual reference system to "mitigate the possibility of damage to the boom [c]over as well as warn the operator as to where potential contact points might occur;" and (5) making the control handles out of a "nonconducting material," which would provide "electrical insulation for the bucket occupant,"or creating an "indirect link" between the controls and the actual system "in the form of rope and pulley type systems that would perform the same function as the control levers."  (Kurfess Report at 4-11).

_____

[2]  Altec does not argue that Mr. Frost's testimony fails to satisfy the third prong of the Daubert inquiry, namely that "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." Frazier, 387 F.3d at 1260 (citation omitted).

Both Altec and Penske have moved to exclude Dr. Kurfess's testimony. (Docs. 179, 182).  Altec assails Dr. Kurfess's qualifications and methodology. (Doc. 182 at [unnumbered] 2-3).  Penske concentrates its argument on Dr. Kurfess's methodology, noting that he did not conduct any testing of his design changes, did not publish his design changes, and has failed to establish that his changes are based on generally accepted scientific practices.  (Doc. 180 at 4). Furthermore, Penske claims that Dr. Kurfess based one of his conclusions solely on the opinions of another expert.  (Id.).  Plaintiffs respond that Dr. Kurfess has over fifteen years experience in "electro-mechanical system design," has modified numerous products designed by others, has performed failure analyses, designed guards, and taught "the principles of guarding to his students."  (Doc. 196 at 6). Plaintiffs also assert that Dr. Kurfess reviewed photographs of the site of the incident and of the actual aerial lift involved, examined an exemplar aerial lift, reviewed "the product specifications," and considered the applicable ANSI standards.  (Id. at 7).

Altec challenges Dr. Kurfess's qualifications, claiming that his specialty is metrology and that he has "no training or specialized knowledge with regards to an electrical lineman's job duties, or the manufacturing or design of [aerial lifts]." (Doc. 182 at [unnumbered] 2).  Dr. Kurfess has a Bachelor of Science degree in mechanical engineering, masters degrees in mechanical engineering and electrical

13

engineering and computer science, and a doctorate in mechanical engineering. (Kurfess C.V. at 1). All of his degrees are from the Massachusetts Institute of Technology. (Id.). Dr. Kurfess has also published articles on electromechanical system design, although none of his articles are specifically on point with the opinions he provides in this case. (Kurfess Dep. at 8-9). Dr. Kurfess also teaches courses in mechanical design and has fifteen years of experience in electromechanical system design. (Kurfess Dep. at 192-93). The Court concludes that Dr. Kurfess satisfies the qualifications prong of the Daubert analysis.

The reliability of Dr. Kurfess's opinions, however, is more problematic. While there is no set test for reliability, one court has suggested factors that are useful to examine in an alternative design case. See Milanowicz v. The Raymond Corp., 148 F. Supp. 2d 525, 532-36 (D.N.J. 2001). The Milanowicz court's non-exhaustive list includes: "1) federal design and performance standards" such as OSHA; "2) standards established by independent standards organizations" such as ANSI, "3) relevant literature; 4) evidence of industry practice; 5) product design and accident history; 6) illustrative charts and diagrams" such as a drawing of the alternative design; "7) data from scientific testing; 8) the feasibility of [the] suggested modification; and 9) the risk-utility of [the] suggested modification." Id. at 536. Additionally, "[n]umerous courts have excluded expert testimony regarding a safer alternative design where the expert failed to create drawings or models or

14

administer tests." Zaremba v. Gen. Motors. Corp., 360 F.3d 355, 358 (2d Cir.

2004) (citing Bourelle v. Crown Equip. Corp., 220 F.3d 532, 536-38 (7th Cir. 2000);

Watkins v. Telsmith, Inc., 121 F.3d 984, 991-92 (5th Cir. 1997); Peitzmeier v.

Hennessy Indus., Inc., 97 F.3d 293, 297 (8th Cir. 1996)).

   The Tenth Circuit recently dealt with facts similar to this case. See Vanover

v. Altec Indus., Inc., No. 03-5016, 2003 WL 22854912 (10th Cir. Nov. 28, 2003)

(unpublished). In Vanover, the decedent was electrocuted while working near

power lines in an Altec aerial lift . Id. at *1. When the worker on the ground

attempted to lower the bucket after an initial explosion, a second explosion

occurred and the boom's controls seized. Id. As part of their design defect claim,

the plaintiffs argued that the boom should have had a manual release device

"capable of overriding the mechanism that locks the boom in place following a loss

of hydraulic pressure, allowing the boom to lower to the ground in emergency

situations." Id. at *2. The plaintiffs offered the testimony of an expert witness with

a doctorate in mechanical engineering in support of their alternative design. Id. at

*13-14. The Tenth Circuit affirmed the district court's exclusion of the expert's

testimony on the ground that it did not satisfy Daubert's reliability inquiry. Id. at

*14. The court reasoned that the proposed expert was "not a designer of boom

trucks or aerial lifts; [had] no education or experience with such lifts; [and] his

proposed design is untested and unpublished." Id.

Here, prior to being retained in this case, Dr. Kurfess had never been involved with the design or construction of an aerial lift.  (Kurfess Dep. at 75). Indeed, Dr. Kurfess's only experience with aerial lifts is his examination of an exemplar unit provided by Altec and review of pictures of the aerial lift involved in the incident and other information he received in connection with this case.  (Id. at 149-50).   Dr. Kurfess could not say during his deposition whether the aerial lift complied with the applicable ANSI standards,  (Id. at 118), and testified that he was not familiar with the OSHA standards applicable to linemen activities.  (Id. at 77).  He also was unable to testify as to what material the boom was constructed out of or how the boom was manufactured.  (Id. at 193-94).  Additionally, Dr. Kurfess testified that he had not implemented his design changes to determine how they would actually function in the field, (Id. at 234), and did not submit them for peer review.  (Id. at 221-22).

Specifically, with respect to his opinion that the latch should be moved further down the boom from its current location, Dr. Kurfess was unable to testify as to the distance along the boom the latch should be moved, (Id. at 184-85)[3]; did not perform a risk-utility analysis even though it would have been an appropriate engineering approach to do so, (Id. at 189-90); did not do a failure means and test

_____

[3]  Dr. Kurfess testified that the latch should be moved however far its needs to be "to avoid electrical connection."  (Id. at 185).

16

analysis, (Id. at 190-91); or any other testing.  (Id. at 192-93).  Instead, when asked

whether he had done any testing of his opinion that the latch should be moved, Dr.

Kurfess responded "I've got over 15 years of electromechanical system design,

and this is my recommendation."  (Id.).

As for his opinion that an interlock switch could be added to the aerial lift to

ensure that the boom could not move into the latch position prior to being fully

retracted (a move that damages the insulating cover over the latch), Dr. Kurfess

testified that the switch could be placed in "a variety of places."  (Id. at 138).

However, Dr. Kurfess did not create any design drawings of the switch or where it

would be located on the aerial lift.  (Id. at 139-40).  As plaintiffs point out, Dr.

Kurfess did testify that designing the interlock switch is something that one of his

nineteen year old students at Georgia Tech could do with little difficulty.  (Id. at

141-42).  Dr. Kurfess also testified, however, that he would expect his students to

do a detailed report which "would probably consist of drawings."  (Id. at 218-19).

Dr. Kurfess has done no drawings of the modifications to the aerial lift that he

proposes in this case.

Dr. Kurfess also opines that the operator of the bucket could have been

better protected if the controls in the bucket were made of a non-conductive

material or a rope and pulley control system was used.  However, at his deposition

he testified that he did not know what material the handles in the bucket were

17

made of.  (Id. at 207).   Additionally, Dr. Kurfess could not identify what material he

would use to create the insulated controls:

> Q:  What would the design criteria be for a control handle for an insulated aerial device that you'd have to meet?
>
> Dr. Kurfess: In terms of–I mean, you would look at sort of mechanical stresses that might be put on it so you don't break it.  You would take a look at probably electrical conductivity.  You might need to look at–you'd have to, of course, be careful about exposure to the environment and so forth, where steel might rust due to salt air.  And if you're looking at polymer, it might break down due to exposure to the sun.  These are the type of things that you look at.
>
> Q: Have you done any of that?
>
> Dr. Kurfess: No, but there's lots of material on that area, and it would be relatively easy to look it up, and these types of devices are out there in the field.
>
> Q: On insulated aerial devices?
>
> Dr. Kurfess: No, but on a variety of – well, actually I shouldn't say no.  I have no idea whether they're on insulated devices, but they are on a variety of different types of construction equipment and machine tools and things like that that would have, you know, similar types of usages.
>
> . . .
>
> Q: What type of nonconductive material would you use?
>
> Dr. Kurfess: You'd have to take a look at the particular situation.  You could make use of a – of a composite.  You could make use of a plastic, you know, of rubber.  I mean, I haven't particularly thought, you know, what specific material you could use. . . .

18

(Kurfess Dep. at 209-10) (emphasis added).  Dr. Kurfess also testified that he did not do any "evaluation or research" to determine whether a nonconductive control handle exists.  (Id. at 220).[4]  Additionally, Dr. Kurfess did not do any diagrams or design drawings of his proposed rope and pulley system.  (Id. at 216-17).  Instead, Dr. Kurfess testified that "[t]he solution was simple and so obvious that it didn't make sense to go much further."  (Id. at 217).

Finally, Dr. Kurfess concludes that the new latch cover designed by Altec reduces "the danger of the boom being energized via an electrical contact to a power line that would run across the opening of the hole."  (Kurfess Report at 7).  With respect to this opinion, Dr. Kurfess could not testify, based on his own experience and testing, that the new cover is better than the old cover.  (Kurfess Dep. at 254).  Dr. Kurfess also did no testing on either of the latch covers to determine whether the new cover was superior.  (Id.).  Instead, Dr. Kurfess testified that he relied solely on his discussions with another of plaintiffs' experts – Dr. Dorsey – in formulating his opinion.  (Id. at 250-51).

_____

[4]  Dr. Kurfess testified as follows:
>
> Q: Have you done any evaluation or research to find out whether such a nonconductive control handle exists?
> Dr. Kurfess: Again, beyond, you know, what I've seen in industry, no, there has been no other evaluation.

(Id.).

While Dr. Kurfess is qualified and his ideas are not implausible, he has simply not developed or tested them sufficiently to meet the reliability requirement of Daubert.  The Court is left with nothing more than Dr. Kurfess's assurances that his opinion is correct and that his design modifications are simple and obvious. However, the Court's "gatekeeping function requires more than simply taking the expert's word for it."  Frazier, 387 F.3d at 1261 (quotations and citations omitted). Dr. Kurfess's testimony is therefore due to be excluded as plaintiffs have failed to show that it is reliable under the Daubert standard.

### C.  John Dorsey

Dr. Dorsey is a professor in the School of Electrical and Computer Engineering at Georgia Tech.  (Dorsey C.V. at 1).  He opines that "a circuit was completed from the 69 Kilovolt [] line to ground, and that circuit was completed by Mr. Martinez's upper body with current flowing through Mr. Martinez, through Mr. Martinez's clothing, and through the air immediately around Mr. Martinez, which became ionized, and hence conductive, when the discharge occurred."  (Dorsey Report at 1).  Dr. Dorsey also concludes that a significant contributing factor to this incident was the exposed metal latch on the boom of the aerial lift.  (Id.).

Altec argues that "[g]iven his lack of knowledge concerning the alleged flow of electricity, both through the [aerial lift's] boom, bucket and control handles as well as through Mr. Martinez's body, his testimony on this matter will only serve to

mislead and confuse the jury." (Doc. 181 at [unnumbered] 10).  Additionally, Altec

points out that Dr. Dorsey has never operated, tested, or seen an exemplar aerial

lift, and that he cannot demonstrate that his theory has been subjected to peer

review or has been accepted by the relevant scientific community.  (Id. at

[unnumbered] 11).  Penske also argues that Dr. Dorsey did not perform any

testing, did not submit his theory for peer review and indicated that his theory

would likely not pass peer review, did not offer any data as to a potential rate of

error, and did not testify that his theory was based on generally accepted practices

in the relevant scientific community.  (Doc. 180 at 4-5).

Plaintiffs respond that "Dr. Dorsey's entire career has been building

mathematical models of occurrences to explain and corroborate what other people

who have different expertises have observed." (Doc. 196 at 8).  Plaintiffs further

argue that Dr. Dorsey has studied the effects of electric current on the human body

and has extensively researched the available literature on the range of resistance

the human body presents.  (Id.).  Additionally, plaintiffs point to Dr. Dorsey's

testimony that the model he created for this case is consistent with the available

literature in the field and would be accepted by electrical engineers.  (Id. at 9).

Finally, plaintiffs assert that repeatable testing is not an option in cases involving

electrocutions, and that this is not the type of situation on which people do

academic research.  (Id.).

Altec first challenges Dr. Dorsey's qualifications to render the opinions he offers in this case.  (Doc. 181 at [unnumbered] 10).  Dr. Dorsey has been a professor in the School of Electrical and Computer Engineering at Georgia Tech for approximately 25 years.  (Dorsey C.V. at 1).  While at Georgia Tech, he has taught classes in circuits and systems, power systems analysis, power system engineering, power system stability, and electromechanical systems.  (Id. at 2).  Dr. Dorsey also teaches fault analysis for the professional engineering test, which involves "calculating high currents and high voltage systems."  (Dorsey Dep. at 61).  He also has a masters and doctorate degree in Systems Science from Michigan State University.  (Id.).  Additionally, Dr. Dorsey's career has been centered around building mathematical models concerning electricity, including situations involving high voltage levels.  (Id. at 204-05, 15-17).  While Altec correctly points out that Dr. Dorsey has no prior experience with creating a model for the flow of electricity through a human or designing aerial lifts, those concerns relate to the weight and credibility of Dr. Dorsey's testimony, not his qualifications. See Indiana Ins. Co., 2001 WL 1823587, at *7; Marmol, 1997 WL 88854, *5.  The Court finds that Dr. Dorsey satisfies Daubert's qualifications inquiry.

Defendants also assail the reliability of Dr. Dorsey's conclusions by pointing out that his methodology does not satisfy any of the four factors courts consider when reviewing the reliability of an expert: testing, peer review, known rate of

error, and general acceptance in the relevant scientific community.  (Doc. 180 at 4-5; Doc. 181 at [unnumbered] 10-11).  However, these four reliability factors "are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."  Frazier, 387 F.3d at 1262.

Defendants first assert that Dr. Dorsey's opinions are unreliable because he did not test the aerial lift involved in Mr. Martinez's incident, has not examined an exemplar aerial lift, and has not tested his model of how the electricity traveled through Mr. Martinez.  (Doc. 180 at 4; Doc. 181 at [unnumbered] 11).  However, "there is no requirement that an expert personally perceive the subject of his analysis."  Traharne v. Wayne Scott Fetzer Co., 156 F. Supp. 2d 717, 724 (N.D. Ill. 2001) (quoting NutraSweet Co. v. X-L Eng'g Corp., 227 F.3d 776, 789 (7th Cir. 2000)).  Dr. Dorsey reviewed photographs taken at the scene of the incident and Mr. Martinez's burn diagrams.  (Dorsey Report at 2).  Additionally, Dr. Dorsey testified that his understanding of how the bucket of the aerial lift could become energized was formulated from Altec documents discussing that issue, as well as diagrams, and "schematics" and "pictorials" of the aerial lift and the modified cover. (Dorsey Dep. at 145, 285-86); see Traharne, 156 F. Supp. 2d at 723-24 (holding that, in a case involving an electrocution from an allegedly defective sump pump, defendant's argument that plaintiff's expert failed to examine the allegedly

defective product could be explored on cross-examination and was not a basis for finding his testimony unreliable under <u>Daubert</u>).  Dr. Dorsey also relied on the standard calculation for arcing properties in considering whether the exposed latch on the aerial lift's boom contributed to Mr. Martinez's injuries and whether this incident would have been prevented by the modified cover.  (<u>Id.</u> at 43-49, 248-49, 283-84).  Finally, Dr. Dorsey noted that he could not electrocute a person four or five times to test if his model accurately predicts exactly how the current flowed through Mr. Martinez.  (<u>Id.</u> at 297).  Dr. Dorsey did testify, however, that his model is consistent with the burn diagrams and pictures of Mr. Martinez's injuries.  (<u>Id.</u> at 203-04).  The Court therefore finds that, while defendants' contention that Dr. Dorsey failed to perform adequate testing to support his conclusions certainly can be explored on cross-examination, it is not a basis to find his testimony unreliable. <u>See</u> <u>Traharne</u>, 156 F. Supp. 2d at 723-24.

Defendants also point out that Dr. Dorsey testified that he has no intention of publishing his model of the path the electricity traveled in this case, and that he probably did not have enough information to publish his model in an IEEE publication.  (Dorsey Dep. at 304).  While this certainly is evidence that Dr. Dorsey's model has not been subjected to peer review, as the Supreme Court pointed out in <u>Kumho Tire</u>, "[i]t might not be surprising in a particular case . . . that a claim made by a scientific witness has never been the subject of peer review, for

the particular application at issue may never previously have interested any scientist."  526 U.S. at 151.  Indeed, the <u>Daubert</u> Court specifically noted that "[s]ome propositions . . . are <u>too particular</u>, too new, or of <u>too limited interest to be published</u>."  <u>Daubert</u>, 509 U.S. at 593 (emphasis added).  Dr. Dorsey testified that while a paper setting forth his model for this case would probably not be published, "the kind of situation that we're involved in here is not the kind of situation that people do academic research on."  (Dorsey Dep. at 300).  Dr. Dorsey also testified that he used standards from the available literature in this area to estimate the flow of electricity over Mr. Martinez's skin, (Dorsey Dep. at 209-10, 212), and looked at the available literature "to see if there was anything . . . which would contradict the conclusions [he] had come to, and [] found nothing . . . which contradicted the conclusions [he] had come to."  (<u>Id.</u> at 295).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  <u>Daubert</u>, 509 U.S. at 596.  Defendants' motions to exclude the testimony of Dr. Dorsey are due to be denied.

Accordingly, it is hereby **ORDERED**:

1.     Altec's Amended Motion to Exclude or Limit Testimony of Expert Witness John Frost (Doc. 186) is **DENIED**.

2.      Penske's Motion to Strike Plaintiffs' Expert Witnesses Testimony (Doc. 179) is **GRANTED** insofar as it seeks to exclude the testimony of Thomas Kurfess, and is **DENIED** insofar as it seeks to exclude the testimony of John Dorsey.

3.      Altec's Motion to Strike the Testimony of Thomas Kurfess (Doc. 182) is **GRANTED**.

4.      Altec's Motion to Strike the Testimony of John Dorsey (Doc. 181) is **DENIED**.

**DONE AND ORDERED** at Jacksonville, Florida this 3rd day of August, 2005.

_____
TIMOTHY J. CORRIGAN
United States District Judge

j.
Copies:

counsel of record